*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JUSTIN RAY MASON,

        Defendant-Appellant.

UNPUBLISHED
May 28, 2026
12:47 PM

No. 366024
Presque Isle Circuit Court
LC No. 2021-093168-FC

Before: TREBILCOCK, P.J., and BOONSTRA and LETICA, JJ.

PER CURIAM.

Defendant, Justin Ray Mason, appeals by right his jury-trial convictions for first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a) (sexual penetration of a person under 13 by a person 17 or older), second-degree criminal sexual conduct (CSC-II), MCL 750.520c(1)(a) (sexual contact with a person under 13 years by a person 17 or older), third-degree criminal sexual conduct (CSC-III), MCL 750.520d(1)(a) (sexual penetration with a victim older than 13 but younger than 16), and fourth-degree criminal sexual conduct (CSC-IV), MCL 750.520e(1)(a) (sexual contact with a person at least 13 but under 16 years by a person five or more years older). The trial court sentenced defendant to serve terms of imprisonment of 25 to 50 years for the CSC-I conviction, 86 months to 15 years for the CSC-II conviction, 85 months to 15 years for the CSC-III conviction, and 16 months to 2 years for the CSC-IV conviction. The court ordered that the sentences for CSC-I and CSC-II be served consecutively to each other, but that the sentences for CSC-III and CSC-IV run concurrently. The court also imposed lifetime electronic monitoring. On appeal, defendant contends that he is entitled to a new trial because his defense counsel was impaired by alcohol during a critical stage of his trial and because defense counsel intentionally elicited detailed, damaging, and prejudicial testimony from the complaining witness about defendant at trial. In light of our agreement with defendant's latter claim,[1] we reverse the trial court's order denying defendant's motion for a new trial, vacate defendant's convictions, and remand for a new trial.

---

[1] In light of our resolution, we need not address defendant's other claim.

## I. BACKGROUND

### A. TRIAL TESTIMONY

This case arises from allegations that defendant sexually assaulted MP, his first cousin once removed, when she was 11 years old and defendant was in his twenties, and again when she was 15 years old. MP testified that when she was 11, he babysat her and her 7-year-old sister, LP, after school. Defendant drove the girls and their 8-year-old friend CB to a state park, where he was drinking "little bottles of UV Blue." During their time in the park, MP watched defendant lift LP into a tree and "grab her by the butt," which made MP uncomfortable and scared. Defendant later took the three girls to a bar, giving them money to play a claw machine while he continued to drink alcohol.

Although MP understood that defendant was supposed to bring the girls to MP's grandmother's home, he took them to MP's home. MP began to feel unwell. Defendant responded by rocking and holding her before carrying her into her bedroom. While defendant had invited LP to join them, MP told her not to. Defendant then laid down with MP on her bed, began "snuggling" with her, and then began licking from her shoulder to her neck. MP asked defendant where her mother was and defendant responded, with slurred speech,[2] that MP's mother was busy. Defendant then put his hand down MP's pants and inserted his fingers into her vagina. Defendant also forced her to put her hand down his pants and touch his penis. Afterward MP, who was crying, ran outside to defendant's car. Defendant met her there, put his hand on her knee, and said, "I'm sorry. I'm so sorry."

MP told defendant that she wanted to go to her grandmother's house. As defendant was driving, Presque Isle County Sheriff's Department Sergeant David Whitford, whom MP recognized as the Drug Abuse Resistance Education officer at her school, pulled over defendant. Whitford asked defendant whether he had been drinking, but defendant denied doing so and Whitford let him off with a warning, directing him to keep his vehicle between the lines.[3]

Upon reaching their destination, MP's grandmother noticed that defendant was drunk; however, she "just let[] it go." MP went into the bedroom and put on a shirt before going into the bathroom, where she noticed that blood in her underwear. She then changed her underwear. Defendant again apologized to MP before he left her grandmother's house.

Then, when MP was 15, she was at her home with her mother, her aunt, and LP. Defendant went there to speak with MP's mother and aunt. Defendant entered the bedroom MP shared with LP. MP was wearing only a large T-shirt and underwear and lying under the blankets of her bed.

---

[2] MP testified that not only was defendant slurring his words, but he was also stumbling and she could smell the alcohol on him.

[3] Whitford testified that he pulled defendant over for weaving on June 1, 2015, but could not recall whether defendant had passengers with him. Although Whitford looked for signs that defendant was intoxicated, there were none, and Whitford allowed defendant to drive away.

Defendant began fondling MP's breasts and inserting his fingers into her vagina. MP started to cry, and defendant covered her mouth until he was done. Defendant then threw $30 on MP's bed.

Initially MP did not tell anyone about the assaults because defendant told her that no one would believe her and threatened to hurt her or her family. As a result of these experiences, MP developed depression, anxiety, panic attacks, pseudo-seizures,[4] and frequently experienced nightmares. MP began taking medication for her depression and working with a counselor, but she denied having any experiences or injuries that would have caused her symptoms.

When MP was in kindergarten, she interacted with a family nurse practitioner. MP was around 11 years old when the nurse practitioner noticed that she was experiencing some sadness and began seeing a counselor. At that time, MP's parents were going through a divorce and MP admitted having "daddy issues." MP also began experiencing anxiety, depression, and pseudo-seizures. MP disclosed the first assault to the nurse practitioner when MP was 16 years old, approximately five years after it happened. The nurse practitioner continued to treat her for anxiety and depression, encouraging her to seek counseling to address her post-traumatic stress disorder.

MP's mother testified that she noticed a change in MP's behavior around the time the first assault occurred. MP became withdrawn, depressed, and began cutting herself. Even after MP began counseling, she had panic attacks, anxiety attacks, bouts of severe depression, and pseudo-seizures. MP disclosed the sexual assaults six months before she attempted suicide in 2020.[5] Her mother, however, did not immediately contact the police or Children's Protective Services (CPS) because she was concerned about retraumatizing MP; however, she eventually contacted CPS four months after MP disclosed the assaults.

Presque Isle Sheriff's Department Detective Joseph Mulka investigated MP's allegations. In October 2020, a forensic interviewer met with MP, who appeared nervous and otherwise exhibited behavior common for children actively disclosing a traumatic event. After reviewing a recording of MP's forensic interview, Mulka asked defendant to come in for an interview. When defendant arrived, he sat down and immediately began "uncontrollable bawling and whimpering." Mulka reminded defendant that he was there voluntarily and was free to leave at any time. As Mulka was in the process of informing defendant about MP's allegations, defendant adamantly denied them, saying: "I didn't do anything," "I never really did anything," and "I know for a fact that I didn't do anything." Mulka also asked defendant about the $30 he allegedly gave MP. Defendant responded that he simply handed MP $30 for no reason when he walked into her bedroom and also gave LP $3 during this visit.

Based on the above conduct, defendant was charged.

---

[4] The pseudo-seizures were described as a physical response to extreme stress resulting from the body's "kind of shutting down."

[5] Initially MP disclosed that defendant had touched her and she was afraid.

## B. DEFENSE COUNSEL'S PERFORMANCE

Throughout the proceedings, defense counsel exhibited concerning behavior. Initially, defendant's trial was scheduled to begin on Monday, October 31, 2022, but defense counsel and defendant were not present at the outset. In dismissing the jurors, the court informed them that defense counsel, who was from out-of-town, opted to leave early in the morning rather than drive up the night before. Counsel also reported that he hit a deer that morning while driving.

During a subsequent show-cause hearing, defense counsel claimed that he had booked a room for the night before trial; however, he was working diligently and decided he could drive up early in the morning. Thereafter, he was involved in an accident and could not make other travel arrangements. Defense counsel apologized and said that he had a card from a police officer, even though he could not provide an accident report. The court opted not to hold defense counsel in contempt, but it assessed costs against him.

The rescheduled trial began in March 2023. While cross-examining MP, defense counsel challenged the credibility of her allegations by referencing her testimony from the preliminary examination. Defense counsel asked MP whether she recalled an incident that occurred at her family's cabin. MP replied that she and defendant had previously stayed at a cabin with family members and friends. Defense counsel asked MP if she had previously testified about "an incident with a dog," and MP agreed that she had. The incident occurred at MP's family's cabin. Two additional relatives and MP's friend were there. Again, drinking was involved. This exchange followed:

> *Q.* And what happened with this dog [MP's aunt's black Lab]?
>
> *A.* [Defendant] was being inappropriate with her and she was yelping and crying, and I thought that she was going to die. And then he told me if I didn't watch then it would happen to me, so I had to watch.
>
> *Q.* Is it true that you testified when you came out of the bathroom, [defendant] was having sex with this dog?
>
> *A.* He was starting to bend down next to her, yes. He wasn't already doing it.
>
> *Q.* He was already engaging in sex—
>
> *A.* He was not.
>
> *Q.* —with the dog?
>
> *A.* His penis was out, but he was not.
>
> *Q.* This dog is a female?
>
> *A.* Yes, correct.

*Q.* So he wasn't engaged in intercourse with that dog when you came out?

*A.* No.

*Q.* You never testified that his penis was inside the dog?

*A.* When I came out it was not in—he was ready, but I don't know the way I was looking it seemed that it was inside of the dog and that she was hurting. . . . I was closing my eyes and covering my ears. And then he made me watch and I'm not sure—

\* \* \*

*Q.* —I'm just confused and I'm not trying to be semantic. I just don't understand if you're saying his penis is in the dog or not at this point.

*A.* . . . I don't know if it was inside of her or if he was just going through the motion. I could not see.

*Q.* And . . . did he pick the dog up or what did he do?

*A.* He was kneeled down.

*Q.* [Defendant] was?

*A.* Yes.

*Q.* And the dog was on the ground?

*A.* Yes.

*Q.* And . . . what did [the dog] do?

*A.* She started trying to bite, yelping.

*Q.* So she tried to get away, basically.

*A.* Yes.

*Q.* And why wasn't she able to?

*A.* He was holding on to her. It did not last very long.

The prosecution objected to this questioning, prompting the trial court to excuse the jury and ask defense counsel to "maybe place on the record what it is you're doing." The court opined that it would have been "reversible error" if the prosecution introduced such evidence, and that defense counsel would have properly asked for a mistrial had the prosecution done so. Defense counsel explained that the purpose of his questioning was to "show how ridiculous her statements

-5-

are," but the court warned defense counsel that the testimony at issue would be very prejudicial if the jury believed it. Defense counsel asserted that he had discussed this strategy with defendant.

Once the jury was deliberating, the trial court informed the attorneys that it would confer with them about any jury questions, and it ordered the parties to not leave the courthouse grounds. Proceedings recessed at 1:38 p.m., then reconvened at 3:17 p.m. to respond to a jury question. Defense counsel was not present, and defendant explained that "[defense counsel] said he had to go to get McDonald's and he should be back and that was 20 minutes ago." Court staff tried to reach defense counsel via phone, checked the premises for him, and attempted to locate his vehicle. Defendant informed the court that defense counsel was staying at an "Airbnb" in the area, but that he did not know its location. The court recessed again and reconvened at 4:34 p.m. after defense counsel returned.

With the parties present, the court read the first jury question and offered a proposed response. Defense counsel did not object. The jury's second question was about how to proceed if it was hung on one or more counts. The court opined that giving the deadlocked-jury instruction might be premature because the jury had not stated that it was deadlocked. The prosecuting attorney suggested a standard deadlock jury instruction and allowing the jury to deliberate longer, and defense counsel agreed. The trial court proposed amending the first sentence of the standard deadlocked-jury instruction to make it consistent with the language of the jury's note. Both parties agreed and the trial court provided those supplemental instructions to the jury.

The court then questioned defense counsel about his absence. He said that he was in his Airbnb and fell asleep before a police officer woke him up. Counsel admitted that he left the courthouse grounds despite the court's specific instruction otherwise. The discourse between the court and defense counsel continued:

> *Q.* * * * this would be your notice and opportunity to be heard as to why I should not hold you in contempt for blatantly violating my order [not] to leave the courthouse grounds and therefore making a deliberating jury wait over an hour.
>
> *A.* Yes, you[r] Honor, I don't have any all I can tell you, your Honor, is the truth. And I was staying over on Maple Street. I went to get a caffeinated beverage because I was very tired. I've given this case everything I have. I haven't eaten in days. I haven't slept in days. And I have no idea—I don't remember falling asleep[,] but I obviously was, on the couch. And when—it was a police officer either named Meyer or Moyer—was there and he was very kind. But that's all I have to say, your Honor, and again, that's just the truth of the matter and I will accept whatever I deserve for that.
>
> *Q.* All right. . . . I guess I do wanna just make sure we have a clear record about this. While you've been back in the courtroom it appears that you've been . . . tired still and I just wanted to give you an opportunity to confirm for the record, you are of a right frame of mind and not under the influence of any substance of any kind, is that correct?
>
> *A.* Yes.

*Q.* Okay. So it's just that you were tired and fell asleep?

*A.* Yes, yes, because—I mean—I've been working on this case.

*Q.* Okay, I understand that. . . . I just wanted that record to be clear because I think people were noticing your extreme fatigue and I just want the record to be clear for any appellate purposes that . . . while we've been on the record, you've been of your right frame of mind?

*A.* Yes.

The prosecuting attorney characterized defense counsel's actions as "an egregious breach of the attorney's trust and their duty." Defense counsel responded:

And, your Honor, if I deserve to be punished, that's fine . . . . But to say what I did is egregious I think is unfair because most attorneys do not put in the work that I do. I go the extra mile for my clients and that's why I haven't slept, that's why I haven't ate [sic] because I gave [defendant] everything I had and that's why after the conclusion that I ran out of energy and everything I had. And again, maybe I deserve to be punished and that's fine but . . . I could be like any other attorney and do half the work and I'd be totally fine and I'd have a lot more energy . . . .

The court then found defense counsel in contempt of court, ordering him to serve 24 hours in the custody of the sheriff. Further, the court said it would be reporting defense counsel to the State Bar.

Following the trial, the trial court held a second contempt hearing, noting that defense counsel had denied being under the influence of any substances when questioned after the trial. But when defense counsel was taken into custody after trial, his preliminary breath test (PBT) during the booking process was 0.15. This, the court said, was a separate issue. Defense counsel responded that "regarding the trial itself, there's no concerns with anything being under the influence there," but he requested an adjournment of the hearing.

At the continued show-cause hearing, defense counsel pleaded not guilty. Kayanna Dean, a corrections officer at the Presque Isle County jail, testified that conducting a PBT was standard booking procedure, and that the PBT she conducted on defense counsel at approximately 6:15 p.m. produced a reading of 0.15. Defense counsel stated that he had admitted responsibility when he had earlier impeded the function of the court, but that he did not believe he had done so in this instance. Defense counsel admitted that he did "have something to drink," but denied being under the influence, or having impaired judgment, during trial.

The court found that defense counsel did lie, observing that defense counsel had to consume a significant amount of alcohol to produce a PBT reading of 0.15. The court emphasized that it did not believe defense counsel was under the influence of any substances until after the jury was sent to deliberate, but it did conclude that defense counsel's conduct and dishonesty

thereafter constituted misconduct. The court again found defense counsel in contempt, but it allowed his additional incarceration to run concurrently with time already served. The court also informed defense counsel that it would report its finding to the State Bar.

## C. MOTION FOR NEW TRIAL AND *GINTHER*[6] HEARING

In December 2023, defendant moved for a new trial or evidentiary hearing, alleging that defense counsel was ineffective, in part, for eliciting testimony about an alleged instance of bestiality on his part. Defendant later filed a supplemental motion for a new trial based on defense counsel failure to provide "meaningful adversarial testing" at trial. Defendant argued that defense counsel's performance was per se prejudicial because he was not competent to provide meaningful adversarial testing of the prosecution's case. Defendant asserted that counsel would have had to consume 7.85 to 8.42 ounces of 100-proof liquor during his absence to have a blood-alcohol content (BAC) of 0.15 when he was booked into the jail. Defendant therefore maintained that a question existed as to whether defense counsel began drinking before or after jury deliberations began. Defendant further argued that, aside from whether defense counsel was under the influence before deliberations began, it was likely that, but for defense counsel's errors, the outcome at his trial would have been different. The trial court granted defendant's request for an evidentiary hearing.

At the evidentiary hearing, Dr. Dennis Simpson identified himself as a neuropsycho-pharmacologist, and also a professor, and head of the Specialty Program in Alcohol and Drug Abuse, at Western Michigan University. Simpson explained that he studied how psychoactive, psychotropic, and behavior-altering drugs impact a person's body and behavior. Simpson testified that he reviewed materials from defendant's trial and defense counsel's contempt proceedings and prepared a report regarding defense counsel's alcohol consumption. Simpson opined that defense counsel's BAC of 0.15 during booking indicated that his BAC at the time of trial was at higher levels that would cause gross effects on cognition, memory, error rates, psychomotor skills, and "the totality of . . . function and being." According to a standard accepted formula, Simpson opined that defense counsel would have had a BAC of 1.9 to 2.8 when he returned to court, and, therefore, would have had to consume 7.85 to 8.42 ounces of 100-proof alcohol while the jury deliberated, which Simpson characterized as acute binge drinking. Simpson estimated this consumption as equivalent to approximately four or five two-ounce shots of liquor. Simpson elaborated on the results of such alcohol consumption:

> He would have been grossly impaired in his cognitive functions, his decision-making functions, his retrieval of information to take his decisions, his psychomotor, unless he was a true diagnosed alcohol dependent and there's no indication, he is that. He would have been grossly impaired in all his psychomotor functions; he could not function adequately at that time.

---

[6] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

Simpson further testified that it was possible that defense counsel began drinking before jury deliberations began. The effects of this level of alcohol consumption would be different if defense counsel were alcohol-dependent to some degree or otherwise had a heightened tolerance for alcohol. Simpson further stated that defense counsel's BAC could have still been rising, rather than falling, at the time of his PBT, but Simpson emphasized that this scenario was very improbable.

Geoffrey French, an expert in forensic toxicology and a supervisor at the Michigan State Police Toxicology Unit, testified for the prosecution. French opined that it was important to know when an individual started and stopped drinking, what was consumed, and how much was consumed to accurately calculate the individual's BAC at a given time. French explained that the rate at which individuals metabolize alcohol varied and that PBT results were generally not considered evidentiary breath tests but could be used to determine probable cause for a warrant.

During the hearing, defense counsel testified about eliciting testimony of defendant's alleged bestiality:

> I thought that our whole theory of the case was that the complainant was not truthful and that her stories are—because this isn't a case where you have . . . some kind of DNA evidence or smoking gun in—in that turn to prove [defendant's] innocence. What the theory of the case and what the strategy is, is to poke holes in her story that it's inconsistent that, it doesn't line up, that she can't be trusted, and therefore . . . if we could show she's not truthful in other areas, not believable to the jury, then they shouldn't believe the ultimate accusations against [defendant]. So, the idea that what she was claiming about him, you know, sexually assaulting or whatever you want to call it toward . . . a large dog, . . . it seemed unrealistic, it seemed impossible, it seemed like she was just getting carried away with her own stories. So, I thought that was a good way to show the jury that like look at these fantastical ideas she's coming up with.

Defense counsel testified that he did not feel that this approach would prejudice the jury against defendant, and that he and defendant discussed how silly MP's accusations sounded.

The trial court stated that it understood defense counsel's alleged strategy of highlighting what he believed was a ridiculous claim but noted that defense counsel never presented this argument to the jury. Defense counsel explained that he did not explicitly make this point to the jury because he was not able to explore the issue the way he had hoped. Regardless, defense counsel opined that the challenged testimony did not create any risk of prejudice. The trial court opined that MP's allegation of bestiality was not so "patently fantastical" as to justify eliciting the testimony, and characterized bestiality as "deviant sexual behavior that does occur within the human species."

As to defense counsel's absence during jury deliberations in violation of the court's order not to leave the grounds, defense counsel admitted that he was asleep at his Airbnb. Counsel was tired, wanted to relax, and expected the jury to deliberate longer than it did. Defense counsel emphasized that he did not intend to fall asleep but thought it would be fine to go to his room and

relax. Counsel admitted consuming alcohol before he fell asleep but denied consuming any other drugs. Counsel further acknowledged that he denied using any substances when he returned to court.

Defense counsel agreed that his BAC during the booking process was close to twice the amount the law prohibited for a driver operating a motor vehicle.[7] Counsel drank at least four "shooters" or miniature bottles of vodka; however, he only began drinking when he arrived at his Airbnb and he denied drinking any alcohol during the first day of trial.

Defense counsel also agreed that he had an interaction with law enforcement in Osceola County, Florida, in August 2022, while he was representing defendant. Counsel was arrested and charged with assaulting a firefighter. Counsel declined to say whether he was under the influence of any alcohol or drugs at the time, but he was in a "twelve-month pretrial diversion program" at the time of the hearing. Counsel further agreed that defendant's trial did not begin when originally scheduled, and attributed this to his vehicle issues, recognizing that he had not provided the trial court with attendant documentation.

At the hearing, defendant also testified. He retained defense counsel and met with him before trial. During one pretrial meeting, defense counsel brought up the alleged bestiality incident as something referenced during defendant's preliminary examination; however, counsel did not indicate that he was going to elicit that information at trial. Defendant said that counsel did not discuss his strategy for cross-examining MP with him. Defendant emphasized that he did not want defense counsel to bring up the bestiality allegation and counsel never explained why he decided to do so.

When defendant first retained counsel, he appeared upbeat and happy, but counsel's demeanor changed drastically for the worse as October 2022 approached. Defendant had not attended the first day of his jury trial because defense counsel called him and told him that "court was cancelled." Defendant did not learn defense counsel was involved in a car accident that day until much later.

Defendant further testified that he did not know where defense counsel went during the lunch break on the second day of trial or during jury deliberations. When defense counsel returned, defendant described him as being slumped over, staring off in different directions, and "wobbly" on his feet. Moreover, defense counsel smelled of alcohol when he returned from the lunch break before jury deliberations. Defendant opined that defense counsel was intoxicated. In fact, defense counsel "fell asleep on his hand in the courtroom" and defendant had to awaken him.

After the evidentiary hearing, the trial court held a hearing on defendant's motion for a new trial. The court informed the parties that it had filed a grievance with the State Bar and that disciplinary proceedings were ongoing. The court found defense counsel's testimony consistent with the court's own observations of defense counsel's demeanor at trial, and also with expert testimony that a 0.15 PBT reading could result from heavy alcohol consumption in a short time.

---

[7] Dean testified that defense counsel had a PBT reading of 0.15, even though he did not appear intoxicated or otherwise impaired.

The court noted that defense counsel did not make arguments or statements in the jury's presence after he consumed alcohol and only responded to questions regarding jury instructions. The court concluded that, although defense counsel's behavior caused by his alcohol consumption was troubling, defense counsel's intoxication had no effect on the trial's outcome.

The court considered whether defense counsel's conduct should be reviewed under *Cronic*,[8] in which an attorney's performance is so deficient that prejudice is presumed, or *Strickland*,[9] in which a defendant must show prejudice. The court was unsure whether defense counsel's alcohol consumption rendered him effectively absent from the proceedings under *Cronic* but opined that defense counsel's agreement to the two standard jury instructions in response to the jury's questions was not a critical stage in the proceedings. The court also concluded that the jury's questions were administrative communications regarding certain pieces of evidence, and therefore that there was no presumption of prejudice. Accordingly, the court held that no new trial was warranted in response to defense counsel's intoxication while responding to the jury's questions.

Addressing defense counsel's introduction of bestiality allegations involving defendant, the court found that the probative value of that evidence was clearly outweighed by the danger of unfair prejudice. See MRE 403. The court further found that defense counsel elicited the testimony for the specific strategic reason of showing that MP's claims were ridiculous and untrustworthy but concluded that this was not reasonable trial strategy. Even so, the court found that there was not a reasonable probability of a different result if defense counsel had not elicited the testimony. The court opined that bestiality was not more repugnant than the sexual abuse of a child, and that there was no reasonable probability that the jury would have disbelieved MP's claims of sexual abuse if only she had not testified also to the bestiality allegations. Accordingly, the trial court determined that the defense counsel's having elicited the bestiality evidence did not warrant a new trial.

## II. STANDARD OF REVIEW

Claims of ineffective assistance of counsel present mixed questions of fact and law. *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018). Findings of fact are reviewed for clear error, while questions of law are reviewed de novo. *Id*. "The trial court's findings are clearly erroneous if this Court is definitely and firmly convinced that the trial court made a mistake." *People v Shaw*, 315 Mich App 668, 672; 892 NW2d 15 (2016).

## III. ANALYSIS

"The right to counsel guaranteed by the United States and Michigan Constitutions, US Const, Am VI; Const 1963, art 1, §10, is the right to the effective assistance of counsel." *Shaw*, 315 Mich App 672. "To establish ineffective assistance of counsel, a defendant must show (1) that counsel's performance fell below an objective standard of reasonableness under prevailing

---

[8] *United States v Cronic*, 466 US 648; 104 S Ct 2039; 80 L Ed 2d 657 (1984).

[9] *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

-11-

professional norms and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *Id*. Cross-examination and impeachment of a witness are matters of trial strategy. *People v Thurmond*, 348 Mich App 715, 743; 20 NW3d 311 (2023); *People v Nickson*, 120 Mich App 681, 685-686; 327 NW2d 333 (1982). "This Court does not second-guess counsel on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight." *People v Traver (On Remand)*, 328 Mich App 418, 422-423; 937 NW2d 398 (2019) (quotation marks and citation omitted). Nevertheless, "a court cannot insulate the review of counsel's performance by calling it trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012).

At the *Ginther* hearing, the trial court concluded that defense counsel's strategy of introducing an allegation of bestiality involving defendant at trial to challenge MP's credibility was not reasonable strategy. On appeal, no one disputes that defense counsel's introduction of highly damaging and prejudicial testimony fell below an objective standard of reasonableness under prevailing professional norms.[10]

However, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 US at 691. In this case, the trial court concluded that there was no reasonable probability that the jury would have disbelieved MP's claims of sexual abuse if only she had not testified about bestiality. We disagree.

---

[10] Defense counsel's stated trial strategy was to undermine MP's credibility by showing that she was making ridiculous allegations, including accusing defendant of engaging in bestiality. But as the trial court correctly observed, defense counsel never explicitly made this point to the jury at trial. Before defense counsel broached the topic, neither MP nor the prosecution mentioned it, and the charged sexual assaults did not involve bestiality. Moreover, as recognized by the trial court, MP's allegation of bestiality was not so ridiculous or outlandish that it would clearly leave MP's credibility in doubt. Nor did the challenged testimony clarify or provide context for other harmful testimony MP provided or demonstrate any bias MP might have had against defendant. Instead, defense counsel elicited testimony that defendant engaged in a separate deviant sexual act with a helpless dog. Michigan criminalizes bestiality, defining it as an "abominable and detestable crime against nature. . . ." MCL 750.158. And although this Court has previously recognized that defense counsel's decision to introduce evidence of a defendant's other criminal acts can constitute reasonable trial strategy, those cases are easily distinguishable. Cf. *People v Petri*, 279 Mich App 407, 412-413; 760 NW2d 882 (2008) (Counsel was not ineffective for failing to object to the admission of the defendant's two prior CSC-II convictions, which were admissible under MCL 768.27a, and counsel argued that the victim's mother's knowledge of those convictions caused her to perceive the defendant's innocent conduct as a sexual assault.); *People v Knapp*, 244 Mich App 361, 386 n 7; 624 NW2d 227 (2001) (Counsel was not ineffective for raising the issue of the defendant's prior conviction for sexual misconduct because counsel was attempting to show that the defendant would have admitted to engaging in the alleged wrongful conduct if he were the perpetrator, as he did previously.).

"Where there is relatively little evidence to support a guilty verdict to begin with (e.g., the uncorroborated testimony of a single witness), the magnitude of errors necessary for a finding of prejudice will be less than where there is greater evidence of guilt." *Trakhtenberg*, 493 Mich at 56. In this case, recognizing that there was some corroborative testimony and evidence, MP's testimony about the sexual assaults was key. Defense counsel never explained to the jury how or why MP's testimony about the bestiality was "unrealistic" or "impossible" and made MP's sexual assault allegations improbable. To the contrary, as the trial court recognized, MP's bestiality allegation was not so fantastical or unbelievable as to clearly challenge MP's credibility regarding her own sexual-assault allegations. Given that MP's testimony supplied the evidence that defendant also engaged in sexually deviant behavior with a pet dog, it is highly possible that the jury was more inclined to believe her allegations of sexual assault. Stated otherwise, when defendant was on trial for sexually assaulting an underage relative, the evidence of bestiality was not only highly inflammatory, but also may have induced the jury to find defendant guilty on the basis of its perception of his extreme sexual deviance rather than on the strength of the prosecution's case relying largely on MP's testimony to establish that defendant sexually assaulted her once in 2011 and once in 2015.

For these reasons, we reverse the trial court's order denying defendant's motion for a new trial, vacate his convictions, and remand for a new trial. We do not retain jurisdiction.

/s/ Christopher M. Trebilcock
/s/ Mark T. Boonstra
/s/ Anica Letica